(24 App. Div. 462.)

ANDERSON et al. v. CARTER et al.

(Supreme Court, Appellate Division, Fourth Department. December 18, 1897.)

1. NEW TRIAL—SUCCESSIVE APPLICATIONS—MINUTES—CASE AND EXCEPTIONS.
    In an action to set aside a deed, two issues were tried by a jury, and found for plaintiff; and a motion for new trial was made on the minutes, which was denied. Afterwards plaintiff gave notice of intention to give final proofs, and to move for final judgment. Defendant thereupon moved for leave to make a case and exceptions, and to move for new trial thereon. Such motion was opposed on the ground that a motion for new trial had already been entertained on the minutes, and denied. *Held* not a valid objection, under Code Civ. Proc. § 1347, subd. 2, prohibiting a separate appeal from an order granting or refusing new trial "upon the merits."

2. APPEAL—TIME FOR TAKING—RECORD—PRESUMPTIONS.
    When no motion was made to strike out the notice of appeal on the ground that the time for appealing had expired, and there was nothing in the record showing that such time has expired, the court will not presume an expiration from the fact of long lapse of time since the entry of the order appealed from.

3. CANCELLATION OF INSTRUMENTS—FRAUD AND UNDUE INFLUENCE—EVIDENCE.
    The grantor in a deed of a homestead to a nephew was over 88 years of age, and somewhat enfeebled in mind and body. Her memory had failed so that at times she did not recognize old and intimate acquaintances. She died four months after execution of the deed. The deed was prepared by the nephew's lawyer, at his request, and was taken by him with a notary to the aunt to sign, and she refused. Afterwards he took another notary to his aunt, and she acknowledged the deed in his presence, but had signed it before the notary arrived, while alone with the nephew and his sister, who was assisting him in inducing the aunt to sign the deed. The arrangement that the nephew claimed to have made with the aunt was that he was to support her during her life, and allow her to live in the homestead, in consideration of which she was to deed it to him. Afterwards, in proceedings de lunatico inquirendo instituted against her, the aunt stated (not under oath) that she had not deeded the premises to her nephew, nor signed any paper concerning them, that she knew nothing about the deed, and that it had not been read over to her, but that the

signature looked like hers. *Held* sufficient to warrant a finding setting aside the deed for fraud and undue influence.

4. SAME—DECLARATIONS OF GRANTOR.

In an action to set aside a deed on the ground that the grantor was not of sound mind, or that it was procured by fraud and undue influence, her previous statements touching the disposition of her property, and inconsistent with the deed, in connection with other evidence tending to prove a want of mental capacity, are competent to prove the grantor's mental condition when the deed was executed.

Appeal from special term, Oneida county.

Action by Susan F. Anderson and others against Charles W. H. Carter and others to set aside a deed. Judgment for plaintiffs, from which defendant Carter appealed. Affirmed. Plaintiffs appealed from an order granting leave to said defendant to make a case and exceptions, and to move for a new trial. Affirmed.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

Thomas S. Jones, for appellant.
William Kernan, for respondents.

GREEN, J. It is contended by plaintiffs that an order granting defendant leave to make a case and exceptions was unauthorized, and that, therefore, the only appeal defendant has, which is regular, is his appeal from the judgment. If plaintiffs are right in their contention that the appeal of defendant is from the judgment only, then the court must confine itself to a consideration of questions of law. It follows that the appeal of plaintiffs should be first disposed of.

This action was brought to set aside a deed, and two issues were directed to be tried by a jury: First, whether the grantor was of sound mind and memory, and competent to convey the real estate; secondly, whether the execution of the conveyance was procured by the practice of fraud, deceit, or undue influence. Both issues were found in the affirmative, and a motion was made upon the minutes, upon grounds specified in section 999 of the Code, which was denied. After the lapse of two years the plaintiffs gave notice of their intention to give final proofs, and to move for final judgment, at a special term held by Justice Scripture. The defendant thereupon asked leave to make a case and exceptions, and to move for a new trial thereon, and applied for a postponement of the hearing until such case could be settled, so that the motion might be considered by the court at a term when the final application for judgment was made, and before final judgment. Such motion was opposed upon the ground that a motion for a new trial had been entertained at the circuit held by Justice McLennan, and denied; but the objection was overruled, and the motion granted. The motion for a new trial was made on the case and exceptions at an adjourned special term (Justice Scripture presiding), and the motion was denied. The court disregarded, in its findings of fact, the first issue found by the verdict of the jury, and accepted the finding upon the second issue, and also found that the conveyance was executed without any consideration. These findings are based, it seems, wholly upon the evidence presented to

the jury. The defendant appeals from the judgment, and gives notice of his intention to bring up for review (1) the order denying the motion, made upon the minutes of the court, to set aside the verdict, and for a new trial; (2) the order denying the motion for a new trial made upon the case and exceptions. The plaintiffs appeal from the order giving the defendant leave to make a case and exceptions, and to move for a new trial thereon.

Plaintiffs contend that the order denying the motion made upon the minutes of the court is not reviewable, upon the ground that the time limited for an appeal therefrom had expired. The answer is— First, that no motion has been made to strike out the notice of appeal upon that ground, and there is nothing in the record showing that such time has expired, and the court is not at liberty to assume that it has, simply from the fact of long lapse of time since the entry of the order; and, secondly, that a separate appeal from an order granting or refusing a new trial "upon the merits" is, in such cases, prohibited. Section 1347, subd. 2, Code Civ. Proc. And the reason is obvious,—that as the trial is a preliminary one to the final hearing and determination of the whole issues by the equity term of the court, and the court is at liberty to reject the findings of the jury, or to accept them, and to disregard the errors committed on the trial, if they do not affect the substantial justice of the case (section 1003), it would be improper to allow an appeal from the order denying a new trial until the final trial and disposition of the entire issues. If an order denying a motion, made upon the minutes of the court, is reviewable at all, it must be considered as an intermediate order. Section 1301. And the verdict of the jury, if founded on insufficient evidence, or upon errors committed in the admission of improper, or the exclusion of competent and material, evidence, or if brought about by the erroneous instructions of the court, may materially or necessarily affect the decision and judgment rendered. Section 1316. And see Chapin v. Thompson, 23 Hun, 15. And it does not follow, because an order denying a new trial made after a final verdict is not an intermediate order necessarily affecting the judgment, within section 1316, that an order denying a new trial of specific issues, made before a final hearing and decision of the whole issues by the court, may not be an order of that character, and reviewable as such; for, if the findings are based upon the verdict and the evidence adduced before the jury, as well as the evidence presented to the court at special term, it is obvious that material or substantial errors committed on the former trial, and presumably affecting the conclusions of the jury, may, in the particular case, necessarily affect the decision of the court thereafter rendered. See Bowen v. Becht, 35 Hun, 434.

But the point here raised is unimportant, in view of the fact that a motion upon a case and exceptions was also made upon application for final judgment at the special term, and denied. It is contended that the court had no power to entertain such motion after denial of the motion at the circuit. This objection is not tenable. Section 1003 provides that:

"Where the judge, who presided at the trial, neither entertains a motion for a new trial, * * * a motion for a new trial can be made only at the

term where the motion for final judgment is made, or the remaining issues of fact are tried, as the case requires."

In a note to this section it is stated that:

"This is designed to prevent an indirect appeal from one judge to another, upon a motion for a new trial, except in a case where that course cannot be avoided, as where the application for final judgment is made, or the remaining issues are tried, at a term held by a judge other than the one who presided at the jury trial."

The evident meaning of this is, if the judge presiding at the trial of the specific issues refuses to grant a new trial, his determination cannot be reviewed and set aside by any other judge,—or, more accurately speaking, the verdict may not be set aside,—except by the judge presiding at the term where the application for final judgment is made, or the remaining issues are tried, as the case may be. To hold that the denial of the motion by the circuit court precludes another motion at the equity term of the supreme court would be to presume that the legislature intended by this provision to devest the supreme court of its equitable power in the premises, which theretofore had always been exercised by the court of chancery. Apthorpe v. Comstock, 2 Paige, 482. Where a feigned issue, or any other issue, has been awarded and tried, if either party wishes to apply to the court for a new trial on the ground of any erroneous decision or misdirection of the court or judge before whom the issue was tried, or that the verdict was against the weight of evidence, a case is to be made up and settled in the manner prescribed in the rules of the supreme court in relation to causes pending in that court. 1 Barb. Ch. Prac. 453, 454, et seq. Upon an issue directed, chancery reserves to itself the review of all that passes at law; and one principle upon which a motion for a new trial is made here, and not to the court of law, is that this court regards the judge's report, with a view to determine whether the information collected before the jury, together with that which appears upon the record, is sufficient to enable it to proceed satisfactorily,—to which it did not consider itself competent previously. Id. 455. The only purpose of this clause of section 1003 is to confer upon the judge presiding at the jury trial the power to entertain and grant a motion for a new trial; but it takes nothing from the power of the court, sitting in equity, to set aside the verdict, and direct a resubmission of the specific questions of fact to another jury. "The motion for a new trial upon the minutes, after the verdict, and its denial, does not, we think, preclude the court, upon the trial of the entire case, from disregarding the verdict." "So great a change in the practice of a court of equity is not to be inferred, and can only be sanctioned by clear and explicit provisions for that purpose." Learned v. Tillotson, 97 N. Y. 1, 7, 8. And see Ward v. Warren, 15 Hun, 603. And in the cases it is stated that the practice in chancery has not been changed by the Code. In Bowen v. Becht, supra, and Acker v. Leland, 109 N. Y. 5, 15 N. E. 743, motions to set aside the verdict and for a new trial were made upon two occasions preceding the final trial of the action, and no question was raised. If the verdict is not set aside, the court may give it such weight as it may determine it is entitled to. It may treat it as entirely con-

clusive, and dispense with other evidence upon the issues presented, or it may allow other evidence to be given, or entirely disregard the verdict, and find the fact according to its own judgment. Vermilyea v. Palmer, 52 N. Y. 471; Chapin v. Thompson, 80 N. Y. 275; Id., 89 N. Y. 270; Id., 23 Hun, 12; Carroll v. Deimal, 95 N. Y. 252; Randall v. Randall, 114 N. Y. 500, 21 N. E. 1020; Bank v. Dean, 137 N. Y. 110, 32 N. E. 1108; Whitney v. Whitney, 76 Hun, 585–589, 28 N. Y. Supp. 214.

Where the special term refuses a new trial, and proceeds to base its findings of fact upon the verdict and the evidence presented to the jury, or upon that and additional proofs introduced, the question upon appeal is not, particularly, did the court commit an error in denying the motion? but whether, in the judgment of the appellate court, the findings of fact are sufficiently sustained by the evidence, and that, on the whole facts and circumstances, the result ought not to have been different if the improper evidence admitted had been rejected in the one case, or the proper evidence rejected had been received in the other. An erroneous ruling on a question of evidence, or a misdirection of the court, is not ground for a new trial, unless the excepting party is, upon the whole case, entitled to a judgment for relief. There would seem to be no necessity for making a second motion for a new trial, especially in a case where no other evidence is offered by either party bearing upon the special issues tried, but it is proper and may be advisable to do so. Rule 31 provides for the making of a case or exceptions, or a case containing exceptions, upon such a motion. The practice in the court of chancery was that the party obtaining the verdict must obtain from the clerk of the court in which the cause was tried a certified copy of the minutes of trial, annex it to the pleadings, file the papers in the clerk's office, and thereupon notice the cause for hearing upon further directions. If a new trial of a feigned issue was sought for by either party, it was to be applied for in the same manner as in the case of an issue at law, and would be granted for like causes. 1 Barb. Ch. Prac. 464. Even though no second motion for a new trial is intended to be made, the stenographer's minutes should be produced for the consideration of the court, so that the court may pass upon the efficiency of the evidence and the validity of the exceptions, and determine whether any further evidence bearing upon the special issues should be required. And even in such a case it might be proper enough to make a case and exceptions, to be used in lieu of the stenographer's minutes, if an appeal is ultimately intended.

In this connection it is proper that we should point out and correct a misapprehension of the distinguished judge who delivered the opinion of the court in Bowen v. Becht, 35 Hun, 434, in respect to the prohibition of appeals from orders granting or refusing new trials "upon the merits" in cases of this character. Code Civ. Proc. § 1347, subd. 2. The appeal in that case was from the judgment, and from two orders denying motions for a new trial. As the Code has not undertaken to define precisely what is to be understood as the "merits," he probably thought it was intended to limit and restrict the consideration of the effect of the evidence to the jury and

the court before which the application to set aside the verdict, and for another trial, should be made. The only purpose of this pro- hibition was to prohibit a separate appeal from the order, for to construe it otherwise would be to place a restriction upon the appellate court in reviewing the sufficiency and effect of the evidence. The appellate court is vested with ample power to review the evidence, and to determine the facts for itself, notwithstanding the verdict of the jury and its acceptance by the trial court. The authorities above cited clearly establish this. In 1 Burrill, Prac. 468, it is stated that:

"New trials are allowed on the merits in the following cases, viz.: On account of the absence of the party, or his counsel or witness; or the ground of surprise; of newly-discovered evidence; where the verdict is against law or evidence; for misdirection of the judge, or for the admission or rejection of evidence by him; for excessiveness of damages; and for smallness of damages."

Evidently, therefore, the distinction attempted to be drawn by the learned judge is without merit.

We conclude, therefore, that the proper practice was pursued by the defendant, that the learned trial justice at special term was authorized to grant the order, and that such order should be affirmed. If we are correct in this, then this appeal brings up for review all the questions of fact and law.

The deed, which it is the object of this action to set aside, bears date April 8, 1889, was executed by Myra H. V. Anderson to the defendant Charles W. H. Carter, and purports to convey the premises where the grantor then resided, situate in the town of Kirkland, in the county of Oneida, of the value at the time of the execution of the deed of about $5,000. August 4, 1889, Myra H. V. Anderson died intestate in the house situate upon the premises described in the deed. The grounds upon which it is sought to set aside this deed are: First, that the grantor, at the time it is claimed the deed was executed, was of weak and unsound mind, and incompetent to convey real estate; second, that the deed in question was procured to be executed by her by and through the fraud, deceit, or undue influence exercised by the defendant, Charles W. H. Carter, and practiced upon her by him and others in his behalf. All the heirs at law of the grantor are parties to this action. They are the nephews and nieces of the grantor, except the defendants O. Everitt Carter and Robert Carter, who were children of a predeceased niece. The defendant Charles W. H. Carter alone answered. He admitted the execution of the deed, denied the other allegations of the complaint, and alleged that the instrument in question was the free and voluntary act of the grantor. This action was first tried at a special term, June 3, 1890, before Justice Kennedy, and a decision of the court thereafter rendered, setting aside the deed of the premises described in the complaint, and judgment was entered in accordance with such decision. The defendant Charles W. H. Carter appealed from that judgment, which was reversed by the general term, without opinion, and with only this memorandum: "Judgment reversed on the law and facts, and a new trial ordered, with the costs

of this appeal to abide the event." Thereafter a motion was made by plaintiff, at special term, for an order directing these issues to be tried by a jury: First, whether the grantor was of sound mind and memory, and competent to convey the estate; and, secondly, whether the execution of the conveyance was procured by the practice of fraud, deceit, or undue influence, exercised by the defendant W. H. Carter, and practiced upon her by him and others in his behalf. Upon such motion an order was made granting the same, and these issues were brought on for trial at a circuit of the supreme court, May 7, 1892, before Mr. Justice McLennan and a jury, and the jury rendered a verdict answering both the issues or questions of fact in the affirmative. Thereafter a case and exceptions were prepared, and a motion for a new trial thereon made before Justice Scripture, and denied. The same justice presided at the special term, where the remaining issues of fact and law were tried. All the evidence was before, and considered by, him; and he thereafter rendered his decision, upon which was entered the judgment from which an appeal has been taken. The evidence upon the issues of fact in this case has been presented and passed upon—First, by Justice Kennedy, at a special term, where all the issues in the case were presented; secondly, by the jury at circuit, which passed upon the controlling questions of fact in the case; thirdly, by Justice McLennan, upon a motion for a new trial, upon the minutes; and, fourthly, by Justice Scripture, before whom the case was tried at special term, and who passed upon the evidence and all the issues presented in the case. In each instance the decision of the justice of this court, or the verdict of the jury, has been adverse to this defendant; for in each instance it has been declared that the deed in question was procured to be executed by Myra H. V. Anderson, by and through the fraud, deceit, and undue influence exercised by Charles W. H. Carter, practiced upon her by him and others in his behalf.

But it is contended by this appealing defendant that error has been committed, for the reason—to put it in the words of his counsel in the printed brief—"that such a finding was a finding without any evidence to sustain it"; and, upon this branch of the case, the counsel makes that the predominating question. I have carefully considered the argument of the counsel, and have critically examined the entire evidence in the light of this argument, with a view of bringing clearly to my mind the acts of the parties, and the conditions and circumstances surrounding the execution of this instrument. The result of such investigation is adverse to the contention of appellant. There was sufficient evidence before the jury to sustain its verdict. The learned trial justice, in deciding the questions of fact, adopted the verdict of the jury, as he was justified in doing, and his findings of fact are fully sustained by the evidence.

The appellant was a nephew of the deceased, living in the city of Brooklyn, where he had resided for many years. On the 25th day of March, 1889, he, with his wife, went from Brooklyn to the home of Miss Anderson, remained two days, and then returned to Brooklyn; his wife, however, remaining with Miss Anderson.

Shortly after the departure of the defendant Carter, his sister, Mrs. Mandeville, arrived from Brooklyn at the residence of Miss Anderson. Immediately upon her arrival, the wife of the defendant returned to her home. The defendant procured to be prepared, in the city of New York, the deed in question, and an agreement, whereby he contracted, in consideration of the conveyance to him of the premises described in the deed, to support and maintain Miss Anderson during her life, and that she should have the possession of the premises in question during that time; and also a power of attorney, whereby Miss Anderson empowered the defendant Carter to enforce and collect any and all claims which she might have against any person, growing out of, or arising by virtue of, a loan which she had made to parties in New York. When these papers had been prepared, defendant Carter, on Saturday, the 6th day of April, 1889, went from Brooklyn to the residence of Miss Anderson, taking with him these papers. After his arrival on that day, he went to the village of Clinton, called upon Hiram W. Mahan, a notary public, and requested him to go to the residence of Miss Anderson, and take her acknowledgment of the papers in question. The defendant and the notary went to the residence of Miss Anderson. As the witness Mahan appears to have been a thoroughly disinterested party, and evidently truthful and desirous of giving an exact account of what took place at that time, it is proper to quote to some extent from his evidence. After testifying that they went together to the house of Miss Anderson, he says:

"I entered with him at the east door. There we met Mrs. Mandeville, and from there we went up the steps, and around into the front room. There I saw Miss Myra Anderson,—Aunt Myra, as she was generally known. She sat upon a sofa. Miss Myra M. Anderson came in, and took a seat at her right. Mrs. Mandeville took a seat at her left, or vice versa. On the opposite side, on the east side of the room, was a bedroom. The door was open, and a stand and a pen and ink and inkstand and pen lay there. Mr. Carter came to her, and asked her (Aunt Myra) if he should help her up from the lounge. She sprang up very spryly, raised both her hands above her head, and, 'Whoop! I am up,' and started with him for this bedroom. When we reached about the door, he signaled for me to follow. Miss Myra Anderson said, 'Mr. Mahan, be careful what you do.' Mrs. Mandeville said, 'Aunt Myra don't know what she's doing.' Mrs. Mandeville denied it, and said, 'You said so.' That made a little discussion between the two, which I paid little or no attention to. I started for the bedroom door. As I reached the door, I heard Aunt Myra say, 'I won't do it,' in a short, quick, snappish sort of a way. Mr. Carter said to me: 'Aunt Myra has declined to sign. I am sorry to have made you this trouble. I will pay you.' I says: 'No apology, sir.' He says: 'How much do you charge?' Says I: 'About fifty cents.' He handed me out a silver dollar, and said that was cheap enough. * * * This was Saturday afternoon, near night. It was quite dusk when I got to the village. The next morning, at ten o'clock, we had a class meeting in the basement of the Methodist Church, and I attended. A gentleman came down below, and said that a lady was waiting in the vestibule, and wanted to see me. As I went upstairs I met Mrs. Mandeville. She says: 'Mr. Carter has requested you to come up this evening after dark, so the girls won't see you; and Aunt Myra has made up her mind to acknowledge the papers.' I told her to say to Mr. Carter that I didn't think it was an honorable thing, and that I would go to the meeting that evening as usual. She says: 'Will you not come up after meeting, and stay until after twelve o'clock, and execute the papers, and date them to-morrow morning?' I told her to tell Mr. Carter that if this matter

should come before the courts, and I should acknowledge myself as a tool, and made use of to go up in the night to deceive some one, and stay over Sunday, and take the acknowledgment of a poor old lady, it would not be an honorable thing, and I would not do it. That was the end of the conversation on Sunday morning. I had been personally acquainted with Miss Anderson for more than twenty years, from my first coming into Clinton. I had kept a boot and shoe store, and, until her injury, I had had business transactions with her, and with the nieces, and with Mrs. Mandeville, and all of the family, selling them boots and shoes."

Mrs. Mandeville does not, nor does the defendant, deny that she was acting for and under the instructions of defendant in her transaction with the notary. The papers purport to be acknowledged before a Mr. Darling, a notary and a lawyer, residing in the same town with Miss Anderson. Mr. Darling was sworn as a witness in behalf of the defendants and testified that he went to the house of Miss Anderson on the 8th of April, in the afternoon, after 4 o'clock; that he went with Mr. Carter, who came for him; that, when they arrived at the residence of Miss Anderson, only she and Mrs. Mandeville were present. "I first had a talk with Mrs. Mandeville, and talked with her for some time; and then Mr. Carter came up, and handed me those paper. I can't say that the papers were signed while I was present. When they were handed to me, they were signed. Mr. Carter handed me the papers. I asked him if she understood about them, and he said she did, and said he had read them over to his aunt." He further testified that he, at Mr. Carter's request, read the deed, agreement, and the power of attorney of Miss Anderson; and further says that he asked Miss Anderson if she understood the contents of the papers, and she said, "It is to give Mr. Carter this property, but he is not to have it until I die, and he is to take care of me as long as I live;" that he asked her if she acknowledged the execution; that she put on her glasses, looked at the papers, and said she did; that he then took them, and signed the acknowledgments. He further testified upon his cross-examination: "I think I read over the papers, although I am not positive. I cannot positively swear to the formal delivery of the deed, whether I gave them to Mr. Carter or to Aunt Myra. I handed them to somebody after I had signed my name. I gathered them up, and handed them to somebody. They were left there."

The evidence shows that at this time Miss Anderson was over the age of 88 years; that she was somewhat enfeebled in mind and body; that her memory had failed to an extent that she at times did not recognize those who for years had been her neighbors and intimate acquaintances. She died in less than 4 months from the last-named date. There is no evidence that the deed in question, or the other papers which are claimed to have been executed at the same time, were prepared at the request or order or with the knowledge of Miss Anderson. She certainly was not present when they were prepared; and, so far as appears, had never passed a word with the lawyer who prepared them. They were prepared under the supervision and direction of this defendant, and by a lawyer selected by him, in the city of New York. It does not appear that, after their preparation, before their execution, or at the time of the execu-

tion, Miss Anderson consulted with any person concerning those papers or their execution. The papers were signed while only the defendant Carter and his sister were present, and before Darling, the notary, arrived to take the acknowledgments. At the time the acknowledgment was taken, this defendant and his sister, Mrs. Mandeville, and the notary, were the only persons present. It is apparent, also, from the evidence, that it was the intent of this defendant that Miss Anderson should have no opportunity to consult or converse with any person respecting these transactions, except in his presence or under the watchful care of his agent and sister, Mrs. Mandeville; for it is in evidence, and practically admitted by the defendant himself, that, during his stay at the Anderson house at this time, he kept the doors of that house locked during the day as well as the night; and it appears that, before his coming, Miss Anderson's doors were always open to her nieces, who resided next door to her, and they had been accustomed to come to and go from this house without let or hindrance.

In May, 1889, in conversation with her physician respecting the premises in question, she stated that she had made up her mind never to dispose of her property as long as she had use for it. In June, 1889, proceedings de lunatico inquirendo were instituted against Miss Anderson. Upon that inquisition, Henry Darling, Jr., who took the acknowledgment of this deed and of the other instruments, appeared as counsel for the defendant Carter. Miss Anderson was examined and interrogated by Mr. Avery, representing the petitioners in that proceeding, and by Mr. Darling, as counsel for Carter. Her statements were not made under oath. Besides the counsel named and the commissioner, there were present, at the time, a jury numbering 18, the defendant Charles W. H. Carter, and others. In the presence of these persons, Miss Anderson was asked if she had, in April of that year, deeded her place to the defendant Carter, and she said that she had not deeded the place to him. She was asked if she had ever signed any paper concerning her place, and she said "No." She was asked if she had any recollection of any paper having been executed and delivered to her by Mr. Carter, in which he agreed to support her for the rest of her life, and to that she answered "No." She was asked by Mr. Darling, who acted as counsel for the defendant Carter at the time, if she knew about the deed, and she said "No." She was asked if it was read over to her, and she said "No." She was shown the deed by Mr. Darling, and asked by him if the signature thereto was hers, and she said it looked like hers. He asked her if she did not recollect that he came there one evening, and she said she did recollect it. She was asked again by Mr. Darling if she did not remember the paper being read over to her, and she said "No." She was asked if she did not recollect that she had deeded the property to Mr. Carter, under the agreement that he would keep her as long as she lived, and she said "No." On that inquiry, the defendant Charles W. H. Carter was sworn, and testified concerning the execution of the instrument. He further testified that he had told Miss Anderson that the money she had loaned in New York, and

which appears amounted to the sum of $10,000, and was the loan mentioned in the power of attorney, was lost and as good as burned. It appears that, previous to the execution of the deed by Miss Anderson, she had stated that the money which she had loaned in New York had been burned; and yet, notwithstanding that, the power of attorney was executed by her to him, for the purpose of enforcing the collection of the moneys so loaned.

Mr. Carter testified upon the inquisition that he sent his sister, Mrs. Mandeville, for the notary Mahan to come on Sunday night, and Miss Anderson signed the deed on the morning of April 8th, when no one was present but himself and Mrs. Mandeville. What occurred when those papers were signed, or what led up to the signing of the same, is known only to Mr. Carter and his sister, Mrs. Mandeville. She was present at the signing of the papers, and at the time they were afterwards acknowledged. She was present when the attorney Mahan first went to the house to take the acknowledgment of Miss Anderson, and when Miss Anderson positively refused to execute the papers. She acted for her brother in the attempt to procure the notary Mahan to come to the residence of Miss Anderson on Sunday, to remain until midnight, and then take the acknowledgment of Miss Anderson. She resided with Miss Anderson from the time she came to the latter's residence, preceding the time these instruments were signed, until the death of Miss Anderson. She was in daily communication with her. She was present also at the trial before the jury. But, notwithstanding all this, she was not called as a witness.

Such were some of the facts presented by the evidence; or, at least, there was evidence from which the jury and the court might consistently have found that such were the facts in the case. The evidence was conflicting, but there was sufficient before the jury and the court to warrant a finding that such are the facts; and from such facts the jury and the court were justified in finding that the deed in question was not the free, voluntary, and intelligent act of the grantor. The burden of proof was cast upon the defendant Carter to show that the deed which is attacked was the free, voluntary, and intelligent act of the grantor. He has failed to meet the burden thus cast upon him. It is claimed in his behalf that one of the reasons for deeding the property to him was that Miss Anderson desired to protect herself from want, and to be assured of sustenance and support during the remaining years of her life, and that this was effected by the agreement executed by defendant contemporaneously with the deed; and it is claimed that she believed, at or about the time of the execution of the deed by her, that all the property remaining to her was the premises in question. It appears that Miss Anderson, at the inquisition in June, stated that the money which she had loaned in New York had been burned up; that she had been so informed by Mr. Carter. The latter denies making that statement to her, but admits that he told her that the money was lost and as good as burned. But it appears from the evidence that on March 29, 1889, she had received $100 upon the New York loan. The defendant himself testified with reference to the New

York loan and to the payments thereon: "I knew the fact from
Ward and Budd that they sent my aunt money from time to time,
and sent it to her up to the time she died." It appears also from the
evidence of the defendant that Miss Anderson had requested him
to act for her at various times in the collection of those moneys, and
that he had so acted, and that their relations with each other were
of a confidential nature. It is true that there is evidence also, in
behalf of the defendant, of the intention of the grantor to deed this
property to him, and of her statement after the execution of the
papers that she had so conveyed the property to him; but it seems
to me that it falls far short of overcoming the evidence of the plain-
tiff to the contrary. He gives no explanation of the secrecy resorted
to by him in obtaining the execution of this instrument, nor why the
papers were prepared in New York, nor why he desired Mahan, the
notary, to take the acknowledgment at midnight; neither does he
explain the refusal of the grantor to sign the deed; neither is any
valid explanation given by him for keeping the doors of Miss An-
derson's house locked, contrary to the usual custom of the house. If
Miss Anderson was acting freely and voluntarily, if she desired to
convey to him all the property which remained to her, in consider-
ation of benefits conferred, or to be thereafter conferred, by him
upon her, she must, by her acts or conversation, have evinced that,
and it would have been known to her constant companion, Mrs.
Mandeville; and this defendant would not have hesitated for a mo-
ment to call upon his sister to show the same. If Miss Anderson was
desirous of giving this property to defendant, and had so expressed
herself, there was no occasion for secrecy in the execution of such
intent and purpose.

A review of the evidence in the case satisfies me that the decision
of the court is right, and within the rules of law governing such
cases, and that there is sufficient evidence to sustain the judgment
annulling the conveyance. "Equity will annul a voluntary convey-
ance obtained by persons standing in such relation to the grantor
as to give them a controlling or very strong influence over his con-
duct, upon slight evidence of its improper exercise." Sears v. Sha-
fer, 6 N. Y. 268. "In cases where confidential relations exist be-
tween the parties, the persons obtaining the benefit must show by
the clearest evidence that the gift was freely and deliberately made."
Case v. Case, 49 Hun, 83, 1 N. Y. Supp. 714; In re Smith, 95 N.
Y. 517; Green v. Roworth, 113 N. Y. 462, 21 N. E. 165. "When a
person of advanced years, and infirm, mentally and physically, has
made his attorney his principal beneficiary, and it appears that this
was contrary to previously expressed testamentary intention, that
the attorney was the draftsman of the will, and taking an active
part in procuring its execution, and that the testator acted without
independent advice, the burden is imposed upon the attorney in sat-
isfying the court that the will was the free, untrammeled, intelli-
gent expression of the intention of the testator." In re Smith, su-
pra; Weller v. Weller, 44 Hun, 172.

There were exceptions taken by the defendant to the admission
of evidence in behalf of plaintiffs. One of plaintiffs' witnesses was

allowed, over objection and exception of defendant, to testify concerning a conversation had with Miss Anderson previous to the execution of the deed in question, respecting the disposal of her property.   One of the grounds alleged by plaintiffs for setting aside this conveyance was that, at the time of its execution, the testator was of weak and unsound mind, and incompetent to convey real estate.   A large amount of evidence upon that question was given in behalf of both plaintiffs and defendant, and that was one of the issues in the case which was warmly contested.   I think an answer to defendant's objection is found in the case of Marx v. McGlynn, 88 N. Y. 375, cited by defendant's counsel:

"Where the will is resisted on the ground that the testator was not of sound mind, or that it was procured by undue influence, which involves his mental condition at the time it was executed, his subsequent statements touching the disposition of his property, and inconsistent with the will, in connection with other evidence tending to prove a want of mental capacity, are competent. Such prior or subsequent .declarations are competent evidence on these questions only as tending to prove the testator's mental condition when the will was executed."

Under the issues joined and the evidence, this rule was not materially violated in this case.

Defendant also objected to the admission of the letters of E. B. Budd, containing checks for payments of money upon the New York loan, and alleges error in the reception of the same over his objection.   The defendant called two witnesses who gave evidence which defendant claims tended to show that Budd, the writer of the letters objected to, was not liable on the loan of $10,000 or $15,000 to the grantor, and were allowed to testify that, at the request of the grantee Carter, they had called upon Mr. Budd, who had informed them that he was not liable to Miss Anderson for that loan. It appears to me that the evidence objected to was competent upon the question presented; but, even though it were not competent, the defendant was not prejudiced, for they showed no more than had been before proved without objection, as is shown by the following letter, read in evidence by the plaintiffs without objection:

"New York, March 29th, 1889.

"Miss M. V. Anderson—Dear Madam:   Inclosed please find .check for one hundred dollars.   Will send more in a short time.   Have been very short ourselves, or would have sent sooner.                    E. B. Budd."

Defendant Carter himself testified without objection:

"I knew the fact from Ward and Budd that they sent my aunt money from time to time, and sent it to her up to the time she died."

The order granting leave to defendant to make case and exceptions, and to move for a new trial thereon, is affirmed, with costs. The judgment and order appealed from by defendant are affirmed, with costs.   All concur.